UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Archdiocese of Milwaukee Supporting Fund Inc, On Behalf of Plaintiff and All Others Similarly Situated, | § § § § | Civil Action No. |
| Plaintiff, | § § § | |
| vs. | § § | |
| UNITEDHEALTH GROUP, INC., WILLIAM C. MCGUIRE AND STEPHEN J. HEMSLEY, | § § § | |
| Defendants. | § § § | **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF FEDERAL SECURITIES LAWS**

Plaintiff, individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through plaintiff's attorneys, which included, amongst other things, a review of the defendants' press releases, Securities and Exchange Commission ("SEC") filings by UnitedHealth Group, Inc. ("UnitedHealth" or the "Company") and media reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.     This is a securities class action on behalf of plaintiff and all other persons or entities, except for defendants, who purchased or otherwise acquired UnitedHealth securities (the "Class") during the period May 4, 2001 through April 7, 2006, inclusive (the "Class Period"), pursuing remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Defendant UnitedHealth delivers health care and well-being services, benefit offerings and database and data management services to employers, individual consumers and other health care organizations.

3.     Unbeknownst to investors, and from a time prior to the start of the Class Period, the Company provided erroneous, false and misleading statements and omissions regarding the Company's executive compensation practices, including the backdating of stock option grants to defendants.

4.     On the shocking revelations of April 7, 2006, the price of UnitedHealth stock staged a dramatic decline, losing $2.96 from its closing price of $54.51 on April 6, 2006, to close at $51.55 on April 11, 2006. The stock would finally close on April 28, 2006, at $47.75, corresponding to an overall drop of 12% or $6.76.

5.     During the Class Period, defendants concealed the fact that:

(a)     the Company employed *flawed and defective accounting practices,* resulting in a failure to properly date and thus fairly price its awards of stock options;

(b)     the flawed and defective practice of backdating options would cause the Company to overstate its profits;

(c)     Company insiders, including defendants, took excess and unjustified compensation at the expense of the investment community;

(d)     accounting errors existed in the Company's historic financial statements; and

(e)     the failure to undertake a historical restatement to account for these would make it difficult for analysts and investors to accurately determine the Company's earnings and income for present and future quarters.

## JURISDICTION AND VENUE

6.     Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5.

7.     Venue is proper in this District pursuant to §27 of the Exchange Act.   The corporate headquarters of UnitedHealth are located in the District.

8.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## PARTIES

9.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased shares of UnitedHealth stock at artificially inflated prices during the Class Period as described in the attached certification and was damaged thereby.

10.     Defendant UnitedHealth operates through four segments: Uniprise, Health Care Services, Specialized Care Services, and Ingenix. These segments deliver health care and well-

being services, benefit offerings and database and data management services to employers, individual consumers and other health care organizations. As of December 31, 2005, the Company provided health care services and resources to individuals through approximately 500,000 physicians and other care providers and 4,600 hospitals. UnitedHealth maintains its corporate and administrative offices, where the Company's day-to-day business activities are conducted, at 9900 Bren Road East, Minnetonka, MN 55343.

11.     Defendant William C. McGuire ("McGuire") was, at all relevant times, Chairman of the Board and Chief Executive Officer of UnitedHealth.

12.     Defendant Stephen J. Hemsley ("Hemsley") was, at all relevant times, President and Chief Operating Officer of UnitedHealth.

13.     The individuals named as defendants in ¶¶11-12 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of UnitedHealth quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SCIENTER

14.     In addition to the above-described involvement, the Individual Defendants had knowledge of UnitedHealth's problems, including the backdating of stock option grants personal to them, as well as the millions of dollars in excess compensation afforded them, at the expense of the investment community. Each defendant was motivated to conceal such problems. Defendants McGuire and Hemsley provided for periodic reporting and communications with the market. Communications with the market, including conference calls, as well as internal reports showing UnitedHealth's forecasted and actual growth, were prepared under their direction. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth, expected by the market. Each Individual Defendant also owed a duty to the Company and its shareholders not to trade on inside information.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

15.     Each defendant is liable for (a) making false statements, *or* (b) failing to disclose adverse facts known to him about UnitedHealth. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of UnitedHealth publicly traded securities was a success, as it (a) deceived the investing public regarding UnitedHealth's prospects and business; (b) artificially inflated the prices of UnitedHealth's publicly traded securities; (c) allowed insiders, including defendants to sell 6.7 million shares of Company stock at inflated prices, resulting in proceeds of over $484 million; (d) allowed defendants to reap proceeds of $333 million from their own insider trading, inclusive of millions of dollars of improper and excess profits resulting from the backdating of their stock option grants; and (e) caused plaintiff and other members of the Class to purchase UnitedHealth's publicly traded securities at inflated prices.

## SUBSTANTIVE ALLEGATIONS

16.     From a time prior to May 4, 2001, defendants engaged in the awarding of stock option grants to defendants on specific dates *corresponding to low points in the price of the Company's stock,* thereby maximizing the cash and value of the option grants. Defendants routinely priced and awarded stock option grants to Company insiders, including defendants, in this manner.

17.     For example, the Company used this "price on the dips" methodology to award and price: (i) two stock option grants to McGuire in 1997, including a grant of 200,000 options purportedly on February 11, 1997, and a grant of 250,000 options purportedly on October 27, 1997; (ii) two stock option grants to McGuire in 1998, including a grant of 250,000 options purportedly on January 20, 1998, and a grant of 240,000 options purportedly on October 16, 1998; (ii) three stock option grants to Hemsley in 1998, including a grant of 60,000 options purportedly on February 6, 1998, a grant of 100,000 options purported on August 17, 1998, and a grant of 120,000 options purportedly on October 16, 1998; (iii) four stock option grants to McGuire in 1999, including a grant of 250,000 options purportedly on February 17, 1999, and a series of grants totaling 1,825,000 options, purportedly on October 13, 1999; (iv) three stock option grants to Hemsley in 1999, including a grant of 100,000 options purportedly on February 17, 1999, and two additional grants totaling 910,000 options purportedly on October 13, 1999; (v) one stock option grant to McGuire in 2000, of 650,000 options, purportedly on March 8, 2000; (vi) one stock option grant to Hemsley in 2000, of 300,000 options, purportedly on March 8, 2000; (vii) one stock option grant to McGuire in 2001, of 650,000, purportedly on January 17, 2001; (viii) one stock option grant to Hemsley in 2001, of 650,000 options, purportedly on January 17, 2001; (ix) one stock option grant to McGuire in 2002, of 650,000 options, purportedly on January 7, 2002; and (x) one grant to Hemsley in 2001, of 300,000 options, purportedly on January 7, 2002.

18.     Nearly all of the option grants awarded as part of the Company's executive compensation to defendants McGuire and Hemsley were priced on dips in the price of UnitedHealth stock:

(a)     on February 11, 1997, UnitedHealth stock closed at a price of $46.87 per share, a date that immediately preceded a substantial rise in the price of the Company's stock;

(b)     on October 27, 1997, UnitedHealth stock closed at a low for the year, at $43 per share;

(c)     on January 20, 1998, the stock closed at $47.94, a low which immediately preceded a sharp rise;

(d)     on February 6, 1998, UnitedHealth stock closed at a price of $52.25, a price that immediately preceded a sharp rise;

(e)      on August 17, 1998, UnitedHealth stock closed at a price of $31.94, coming near the bottom of a share price decline;

(f)     on February 17, 1999, the stock closed at $46.81, a price that immediately preceded a sharp rise;

(g)     on October 13, 1999, the stock closed at a price of $40.13, the single lowest closing price for the 1999 calendar year;

(h)     on March 8, 2000, UnitedHealth stock closed at $47.63, the single lowest closing price for the 2000 calendar year;

(i)     on January 17, 2001, the stock closed at $52.69, close to the bottom of a sharp dip in price; and

(j)     on January 7, 2002, the stock closed at $69.55 a price that immediately preceded a sharp rise.

19.     Changes to the federal securities laws, requiring companies to disclose option grants within two days, apparently caused defendants to cease in 2002 their wayward methodology to price option grants. Moreover, an article appearing in *The Wall Street Journal* on March 18, 2006, demonstrated that defendants benefited from hindsight in the determination of

the dates used to award their option grants as cited above. Any other explanation was shown to be statistically impossible, with odds of random chance of approximately one in 200 million. Defendants' representations to the investment community regarding the pricing of their stock options at fair market value are therefore wholly false and misleading in nature.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS
## AND OMISSIONS MADE DURING THE CLASS PERIOD

20.     On April 1, 2002, defendants filed SEC Form 10-K for the year ending December 31, 2001. The filing included the Company's Amended and Restated 1991 Stock and Incentive Plan, Amended and Restated Effective May 9, 2001, which stated in part:

> 5. PRICE.
>
> The option   price   for all Incentive Stock Options granted under the Plan shall be determined by the Committee but shall not he less than 100% of the fair market value of the Common Shames at the date of grant of such option, The option price for options granted under the Plan which do not qualify as Incentive Stock Options and, if applicable, the price for all awards shall also be determined by the Committee, For purposes of this Section 5 and for all other valuation purposes under the Plan, the fair market value of the Common Shares shall be as reasonably determined by such methods or procedures as shall be established from time to time by the Committee; provided, that for the purposes of the first sentence of this Section 5, *the fair market value of the Common Shares shall not be less than the closing price of the stock on the date for which fair market value is being determined, as reported on any national securities exchange on which the Common Shares are then traded.* If on the due of grant of any option or award hereunder the Common Shares are not traded on an established securities market, the Committee shall make a good faith attempt to satisfy the requirements of this Section 5 and in connection therewith shall take such action as it deems necessary or advisable.
>
> ***

21.     Further to defendants' disclosures, Exhibit 13 of defendants' SEC Form 10-K also stated in part:

> STOCK-BASED COMPENSATION

- 8 -

> We do not recognize compensation expense in connection with employee stock option grants because *we grant stock options at exercise prices that equal or exceed the fair market value of the sock on the date the options are granted.*

\*\*\*

22.    On April 4, 2002, defendants filed SEC Form 14A, which stated in part:

> As part of his overall compensation package, Dr. McGuire receives grants of stock options and restricted stock awards from time to time. Pursuant to the terms of his employment agreement, the Company granted to Dr. McGuire in 2001 an option to purchase 650,000 shares at an exercise price of $52.6875 per share, which was the market value of the stock on the grant date.

\*\*\*

23.    Defendants' disclosures of April 1, 2002, and April 4, 2002, were false and misleading. Contrary to defendants' statements, it was the practice of the Company to apply hindsight to backdate option grants, such that they were "priced on the dips," causing the Company to overstate its profits, while allowing Company insiders, including defendants, to take excess and unjustified compensation at the expense of the investment community.

24.    The wayward nature of defendants' backdating of stock option grants practices remained unabated and concealed throughout the Class Period. As already noted, the Company's practice in 2002 was to backdate option grants to the Individual Defendants, such that they were priced on a day when the Company's stock achieved a low or bottom, or priced on a date that was immediately followed by a sharp advance in price.

## THE TRUTH IS REVEALED

25.    On March 18, 2006, *The Wall Street Journal* published an article which provided a careful analysis of stock option grants awarded to executives of several companies. The article presented convincing evidence that defendants' stock option awards had been backdated. Subsequent to this, on April 7, 2006, defendants shocked the investment community when the Company finally revealed that it had received an inquiry from the SEC regarding the wayward

practices outline herein. The Company further explained that it would now appoint a committee of independent directors to review its stock-option grant practices.

26.     Following this shocking news, the share price of UnitedHealth securities staged a dramatic decline, losing $2.96 from its closing price of $54.51 on April 6, 2006, to close at $51.55 on April 11, 2006.

27.     Following the end of the Class Period, on April 26, 2006, the Company announced an "adoption of a number of significant changes in the company's corporate governance policies." Amongst these policies was a promise to "review overall levels of equity-based compensation; performance criteria for equity grants; vesting policies; and level of director compensation." On this dramatic admission of the depth of the problems facing the Company's approach towards executive compensation, the decline in the price of stock accelerated. As a result, the stock would finally close on April 28, 2006, at $47.75, corresponding to an overall drop of 12%, or $6.76.

## LOSS CAUSATION

28.     Defendants' false and misleading statements, material misrepresentations and omissions created and maintained an artificially inflated price for the securities of UnitedHealth, causing the stock to reach a Class Period high of $104.00, where it remained until the end of the Class Period. Throughout the Class Period, defendants maintained this artificially inflated price by concealing those true liabilities that the Company faced, including the overstatement of Company profits and the understatement of tax liabilities.

29.     Defendants' false and misleading statements and omissions in Company press releases and other disclosures were the direct cause of the losses suffered by the Plaintiff and by the Class. It was not until April 7, 2006, that the truth about the Company was finally revealed. As a direct result, the price of the Company's stock has declined $6.76, or 12%.

30.     The timing and magnitude of the decline in the value of UnitedHealth's stock price negates any inference that the loss suffered by plaintiff and the Class was the result of

factors unrelated to Defendant's fraudulent conduct. Throughout UnitedHealth's decline, the Standard & Poor's 500 securities index has been essentially flat.

31. During the Class Period, defendants concealed the fact that:

(a) the Company employed *flawed and defective accounting practices,* resulting in a failure to properly date and thus fairly price its awards of stock options;

(b) the flawed and defective practice of backdating options would cause the Company to overstate its profits;

(c) Company insiders, including defendants took excess and unjustified compensation at the expense of the investment community;

(d) accounting errors existed in the Company's historic financial statements; and

(e) the failure to undertake a historical restatement to account for these would make it difficult for analysts and investors to accurately determine the Company's earnings and income for present and future quarters.

## INSIDER TRADING DURING THE CLASS PERIOD

32. During the Class Period, the following defendants sold their shares in accordance with the following schedule:

| Date | Insider | Shares | Price | Proceeds |
|---|---|---|---|---|
| 11/30/2004 | HEMSLEY, STEPHEN J. | 800000 | $80.60 | $64,479,999 |
| 2/23/2006 | MCGUIRE, WILLIAM W. | 2300000 | $59.10 | $135,930,000 |
| 11/30/2004 | MCGUIRE, WILLIAM W. | 1654000 | $80.60 | $133,312,399 |
| | Totals | 4754000 | | $333,722,398 |

33. During the Class Period, Company insiders, including defendants, sold their shares in accordance with the following schedule:

| Date | Insider | Shares | Price | Proceeds |
|---|---|---|---|---|
| 2/3/2005 | BAHL, TRACY L | 55000 | $90.03 | $4,951,606 |
| 2/2/2005 | BAHL, TRACY L | 25000 | $90.00 | $2,250,000 |
| 7/28/2005 | BALLARD, WILLIAM C. JR | 32000 | $53.03 | $1,696,905 |
| 5/20/2005 | BURKE, RICHARD T. | 64000 | $96.50 | $6,176,179 |
| 2/24/2005 | BURKE, RICHARD T. | 50000 | $88.82 | $4,441,110 |
| 9/6/2005 | ERLANDSON, PATRICK J. | 150024 | $53.00 | $7,951,272 |
| 11/30/2004 | HEMSLEY, STEPHEN J. | 800000 | $80.60 | $64,479,999 |
| 4/3/2006 | JOHNSON, ALFRED ISAACS INT-VI TR U/A DTD 3/14/97 | 51200 | $54.02 | $2,765,824 |
| 7/1/2004 | JOHNSON, ALFRED ISAACS INT-VI TR U/A DTD 3/14/97 | 49000 | $61.39 | $3,007,865 |
| 1/3/2006 | JOHNSON, JAMES A./DC | 12800 | $61.18 | $783,097 |
| 9/22/2004 | JOHNSON, JAMES A./DC | 10000 | $70.32 | $703,199 |
| 9/1/2004 | JOHNSON, JAMES A./DC | 16334 | $65.98 | $1,077,717 |
| 8/2/2004 | JOHNSON, JAMES A./DC | 16333 | $62.05 | $1,013,462 |
| 7/1/2004 | JOHNSON, JAMES A./DC | 16333 | $61.30 | $1,001,212 |
| 6/1/2004 | JOHNSON, JAMES A./DC | 16334 | $65.50 | $1,069,877 |
| 4/7/2006 | KEAN, THOMAS H. | 32000 | $54.65 | $1,748,800 |
| 1/13/2006 | KEAN, THOMAS H. | 32000 | $61.19 | $1,958,080 |
| 5/2/2005 | KEAN, THOMAS H. | 16000 | $94.06 | $1,504,960 |
| 4/1/2005 | KEAN, THOMAS H. | 16000 | $95.75 | $1,532,000 |
| 3/1/2005 | KEAN, THOMAS H. | 16000 | $90.69 | $1,451,040 |
| 2/1/2005 | KEAN, THOMAS H. | 16000 | $88.95 | $1,423,200 |
| 8/2/2004 | KEAN, THOMAS H. | 32000 | $62.22 | $1,990,899 |
| 1/24/2005 | LEATHERDALE, DOUGLAS W. | 39000 | $89.18 | $3,478,020 |
| 8/12/2004 | LEATHERDALE, DOUGLAS W. | 25000 | $64.04 | $1,601,000 |
| 8/10/2004 | LEATHERDALE, DOUGLAS W. | 25000 | $62.68 | $1,567,000 |

| 6/1/2004 | LEATHERDALE, DOUGLAS W. | 25000 | $65.25 | $1,631,250 |
| 5/25/2004 | LEATHERDALE, DOUGLAS W. | 25000 | $63.52 | $1,588,000 |
| 5/14/2004 | LEATHERDALE, DOUGLAS W. | 28000 | $62.79 | $1,758,100 |
| 2/3/2005 | LUBBEN, DAVID J. | 155824 | $90.17 | $14,050,977 |
| 2/23/2006 | MCGUIRE, WILLIAM W. | 2300000 | $59.10 | $135,930,000 |
| 11/30/2004 | MCGUIRE, WILLIAM W. | 1654000 | $80.60 | $133,312,399 |
| 8/13/2004 | MUNDINGER, MARY O'NEIL | 20000 | $64.90 | $1,298,072 |
| 2/2/2005 | MUNSELL, WILLIAM A. | 82544 | $89.88 | $7,419,000 |
| 8/8/2005 | QUAM, LOIS E. | 173200 | $51.18 | $8,864,809 |
| 2/7/2005 | SHALALA, DONNA E. | 61000 | $89.21 | $5,442,000 |
| 4/29/2005 | SHEEHY, ROBERT J. | 80000 | $79.32 | $6,345,900 |
| 4/29/2005 | SHEEHY, ROBERT J. | 140000 | $93.06 | $13,028,330 |
| 9/22/2004 | SHEEHY, ROBERT J. | 90000 | $70.51 | $6,345,774 |
| 4/10/2006 | SPEARS, WILLIAM G. | 32000 | $53.60 | $1,715,200 |
| 1/17/2006 | SPEARS, WILLIAM G. | 32000 | $60.20 | $1,926,400 |
| 5/4/2005 | SPEARS, WILLIAM G. | 12800 | $97.25 | $1,244,800 |
| 4/6/2005 | SPEARS, WILLIAM G. | 12800 | $97.93 | $1,253,504 |
| 3/3/2005 | SPEARS, WILLIAM G. | 12800 | $91.55 | $1,171,840 |
| 2/3/2005 | SPEARS, WILLIAM G. | 12800 | $90.00 | $1,152,000 |
| 1/5/2005 | SPEARS, WILLIAM G. | 12800 | $85.75 | $1,097,600 |
| 10/7/2004 | SPEARS, WILLIAM G. | 32000 | $75.00 | $2,400,000 |
| 9/15/2004 | SPEARS, WILLIAM G. | 32000 | $70.00 | $2,240,000 |

| | | | | |
|---|---|---|---|---|
| 11/24/2004 | WICHMANN, DAVID S. | 80044 | $82.15 | $6,576,000 |
| 11/23/2004 | WICHMANN, DAVID S. | 33000 | $82.33 | $2,717,000 |
| 1/27/2005 | WILENSKY, GAIL R. | 15000 | $87.20 | $1,308,000 |
| 6/2/2004 | WILENSKY, GAIL R. | 14000 | $65.12 | $911,680 |
| | Totals | 6781970 | | $484,352,958 |

## APPLICABILITY OF PRESUMPTION OF RELIANCE

## FRAUD-ON-THE-MARKET DOCTRINE

34.     At all relevant times, the market for UnitedHealth securities was an efficient market, for the following reasons, among others:

(a)     UnitedHealth's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, UnitedHealth filed periodic public reports with the SEC; and

(c)     UnitedHealth regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

35.     As a result of the foregoing, the market for UnitedHealth's securities promptly digested current information regarding UnitedHealth from all publicly available sources and reflected such information in UnitedHealth's stock price.  Under these circumstances, all persons who purchased or acquired UnitedHealth's securities during the Class Period suffered similar injury through their purchase of the aforementioned securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

36.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of UnitedHealth who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased UnitedHealth publicly traded securities (the "Class") on the open market during the Class Period.  Excluded from the Class are defendants.

38.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.   UnitedHealth had more than 1.36 billion shares of stock outstanding, owned by hundreds if not thousands of persons.

39.     There is a well-defined community of interest in the questions of law and fact involved this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Exchange Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     Whether the prices of UnitedHealth's publicly traded securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

40.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

41.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

42.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

43.     Plaintiff incorporates ¶¶1-42 by reference.

44.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

45.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of UnitedHealth publicly traded securities during the Class Period.

46.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for UnitedHealth publicly traded securities. Plaintiff and the Class would not have purchased UnitedHealth publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

47.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of UnitedHealth publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

48.    Plaintiff incorporates ¶¶1-47 by reference.

49.    The Individual Defendants acted as controlling persons of UnitedHealth within the meaning of §20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of UnitedHealth, and their ownership of UnitedHealth stock, the Individual Defendants had the power and authority to cause UnitedHealth to engage in the wrongful conduct complained of herein. UnitedHealth controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and UnitedHealth are liable pursuant to §20(a) of the Exchange Act.

- 17 -

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to FRCP 23;

B.      Awarding plaintiff and the members of the Class damages, interest and costs; and

C.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


DATED:  May 18, 2006                    CHARLES H. JOHNSON & ASSOCS., P.A.

                                        Charles H. Johnson (0050696)
                                        Neal A. Eisenbraun (014860X)
                                        2599 Mississippi Street
                                        New Brighton, MN  55112-5069
                                        Telephone:  651.633.5685
                                        Fax:  651.633.4442

                                        DAVID R. SCOTT
                                        ERIN GREEN COMITE
                                        108 Norwich Avenue
                                        P.O. Box 192
                                        Colchester, CT  06415
                                        Telephone: 860/537-5537
                                        860/537-4432 (fax)
                                        -and-
                                        ARTHUR L. SHINGLER III
                                        600 B Street, Suite 1500
                                        San Diego, CA 92101
                                        Telephone: 619/233-4565
                                        619/233-0508 (fax)

## PLAINTIFF CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

Archdiocese of Milwaukee Supporting Fund, Inc., ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the Complaint and retains Scott + Scott, LLC and Truth in Corporate Justice LLC ("Special Counsel") and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel, or in order to participate in any private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff's transaction(s) in the **UnitedHealth Group, Inc. (UNH)** security that is the subject of this action during the Class Period is/are as follows:

| Transaction Date | Transaction Type | # Shares | Price per Share |
|---|---|---|---|
| 11/13/03 | Buy | 2815 | $24.995 |
| 3/4/04 | Buy | 752 | $31.217 |
| 11/29/04 | Buy | 280 | $41.489 |
| 12/17/04 | Buy | 876 | $42.774 |
| 5/2/05 | Buy | 1000 | $47.50 |
| 7/11/05 | Buy | 3070 | $52.639 |
| 10/27/05 | Buy | 571 | $54.899 |

5.     During the three years prior to the date of this Certification, Plaintiff is currently serving as Lead Plaintiff in the Halliburton Securities Litigation and is a Representative Plaintiff for the debt bond holders in the Enron Securities Litigation.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16 day of May, 2006, at Milwaukee, Wisconsin (city, state).

Paula N. John, Vice President
Archdiocese of Milwaukee Supporting Fund, Inc.

REDACTED